## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| ZAYO GROUP, LLC, *et al.*, | * | |
| | * | |
| v. | * | Civil No. JFM-16-592 |
| | * | |
| MAYOR AND CITY COUNCIL OF | * | |
| BALTIMORE, *et al.* | * | |

\*\*\*\*\*\*

### MEMORANDUM

Plaintiffs Zayo Group LLC, Broadwing LLC, Centurylink Communications LLC,

Comcast of Baltimore City LLC, Crown Castle NG Atlantic LLC, 24/7 Mid-Atlantic Networks

LLC, Fiberlight LLC, Level 3 Communications LLC, Level 3 Telecom of Maryland LLC,

Quantum Telecommunications Inc., Telcove Operations LLC, and Wiltel Communications LLC

(collectively "plaintiffs" or "communications providers") bring suit against defendant Mayor and

City Council of Baltimore[1] ("the City") relating to the City's increase of plaintiffs' conduit rates.

Now pending is the City's motion to dismiss plaintiffs' complaint. The parties have fully briefed

the motion, and no oral argument is necessary. *See* Local Rule 105.6. For the reasons below, the

motion is granted in part and denied in part.

### BACKGROUND

The parties' dispute arises out of the City of Baltimore's September 2015 decision to

more than triple plaintiffs' conduit fee rates. The City owns and maintains a system of

underground conduit—dating back to 1898—that provides the infrastructure for a labyrinth of

electric, telephonic, and fiber optic connections owned by communications providers. By

---

[1] Plaintiffs originally also asserted their complaint against the Baltimore City Department of
Transportation and the Baltimore City Board of Estimates. In plaintiffs' Opposition brief,
however, they acknowledge that these defendants were wrongfully included. (ECF No. 25, p. 12
n.1). Therefore, I dismiss plaintiffs' complaint as it relates to them.

1

Baltimore City ordinance, communications providers—aside from the incumbent, Verizon—are required to place all such connections in the City-owned underground conduit, Baltimore City Code, Art. 26, § 23–7, and pay leasing fees to the City for occupying the conduit.[2] Plaintiffs allege that, as a practical matter, the City requires them to place their connections in the City's underground conduit and functionally prevents them from using or interconnecting with Verizon's conduit system. (ECF No. 1, ¶¶ 32, 56). Further, the plaintiffs allege that when they build their own conduit in places the city-owned system does not reach, the City forces them to turn over ownership of the conduit to the City and then pay fees to occupy the conduit space they themselves built. *Id.* at ¶ 37.

Under leasing agreements with the City, the plaintiffs agreed to pay leasing rates based on their "share of the City's actual cost of owning, operating, and maintaining [the conduit], in proportion to the amount of conduit space occupied by each user."[3] *Id.* at ¶ 131. Plaintiffs' fee payments are placed in the City Conduit Enterprise Fund, where they are used for maintenance and operation of the system. The Baltimore City Board of Estimates ("BOE") is responsible for setting plaintiffs' rates and the Baltimore City Department of Transportation ("DOT") is responsible for maintaining and operating the conduit.

In September 2015, the BOE considered and approved a DOT proposal to set the conduit lease fee at $3.33 per linear foot per year—a more than tripling of the previous conduit fee of $.98 per linear foot. This significant increase came after the rate had only increased

---

[2] Thanks to Verizon's purchase of Baltimore's incumbent communications provider—which contracted with the City in 1889 to construct its own conduit system—Verizon enjoys the right to own and maintain a separate conduit system. Verizon pays less than $.07 per linear foot to rent the underground public right of way, while plaintiffs pay $3.33 per linear foot for conduit space. (*See* ECF No. 1, ¶¶ 25–35).

[3] In addition to paying the conduit fee, plaintiff Comcast has a separate franchise agreement with the City requiring it to pay annual franchise fees of five percent of gross revenue from its cable services. (ECF No. 1, ¶ 61).

incrementally from $.83 to $.98 over the past decade. (ECF No. 1, ¶ 67). The DOT argued that the proposed rates had "been verified to accurately reflect costs associated with operating and capital maintenance as determined to be necessary to bring the system into a good state of repair over the next 8 to 10 years." (ECF No. 14, p. 5) (internal quotation marks omitted). Plaintiffs contend that this increase came as a complete surprise to them—the increase was significantly higher than previous increases and, according to plaintiffs, they learned of the BOE hearing discussing the increase only two days before it occurred. (ECF No. 1, ¶¶ 73, 75).

Although the new fee came into effect starting November 2015, plaintiffs, with the exception of Quantum Telecommunications, continued to pay conduit fees at the old rate of $.98 per linear foot. Plaintiffs sent the City a protest letter explaining that they were continuing their payments at the old rate and proposed meeting with the City to discuss the increase. *Id.* at ¶ 82. Plaintiffs also requested information from the City, pursuant to the Maryland Public Information Act, related to the cost basis for the rate increase.[4] After plaintiffs sent the letter, the parties met but did not reach an agreement on the disputed fees. *Id.* at ¶ 84.

In January 2016, Chief City Solicitor Victor Tervala sent letters to all but one of the plaintiffs alleging that they had breached their contracts and stated that if they did not pay the new conduit fees, the City would terminate their lease agreements and remove their communications facilities (*i.e.*, their electric, telephonic, and fiber optic connections) from the conduit. *Id.* at ¶ 89. In response, plaintiffs suggested more negotiations on the matter and offered to pay outstanding fees on the condition that the City correct any overpayments if the conduit fee increase was deemed unlawful. *Id.* at ¶¶ 92–93. According to plaintiffs, Tervala

---

[4] The City initially told plaintiffs it would produce cost data but later told plaintiffs that in order to do so, plaintiffs would need to pay hundreds of thousands of dollars in legal fees. (ECF No. 1, ¶ 86). In February 2016, the City released a set of records related to the increase, but plaintiffs maintain that they have not received all records responsive to their request. *Id.* at ¶ 96.

rejected their proposal and said that if plaintiffs paid the new fees, the City would immediately spend them. *Id.* at ¶ 94.

In February, the City once more reiterated its position that it refused to accept anything less than full payment. The City imposed a deadline for payment of March 1, 2016—after that day, the City said it would start removing the plaintiffs' communications facilities from the conduit. *Id.* at ¶ 95. The parties met again on February 19, this time the plaintiffs offered to place the disputed funds in escrow pending resolution of the parties' dispute, but the City again declined plaintiffs' settlement offer. On February 25, the City yet again sent out communications to plaintiffs holding firm to its March 1 deadline and also threatened to refuse to issue any more construction permits to the plaintiffs if they did not pay the increased rate. *Id.* at ¶ 103.

Plaintiffs filed the instant complaint on February 29, 2016 against the City. The complaint asserts twelve counts. Plaintiffs allege violations of the Telecommunications Act of 1996, 47 U.S.C. § 151 *et seq.* ("TCA") (Count I), Baltimore City Charter art. VI, §3(b) (Count V), the City's police power (Count VI), the Fifth Amendment (Count VII), the First Amendment (Count VIII), 42 U.S.C. §§ 1983 and 1988 (Count IX), and counts of tortious interference with economic and contractual relations (Count X), unjust enrichment (Count XI), and declaratory judgment (Count XII). Plaintiff Comcast asserts that the City has violated § 542 of the Cable Act of 1992, 47 U.S.C. § 521 *et seq.* (Count II), and breached their contract and franchise agreement (Count IV). Plaintiffs Zayo, Level 3, Crown Castle, FiberLight, and Quantum also allege a breach of contract claim (Count III).

After the filing of the lawsuit, the parties agreed that plaintiffs would pay the disputed fees—the difference between the new fees and old fees—into escrow pending resolution of

plaintiffs' request for a preliminary injunction. (*See* ECF No. 20, p. 9). On May 17, 2016, I held a hearing on plaintiffs' request for a preliminary injunction. At the end of the hearing, I ordered continuance of the escrow agreement. Currently pending is the City's motion to dismiss (ECF No. 14) and plaintiffs' motion to strike or for leave to file surreply (ECF No. 34).

## STANDARD

The City moves to dismiss plaintiffs' complaint under Rule 12(b)(6). To survive a Rule 12(b)(6) motion, a complaint, relying on only well-pled factual allegations, must state at least a "plausible claim for relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). The "mere recital of elements of a cause of action, supported only by conclusory statements, is not sufficient to survive a motion made pursuant to Rule 12(b)(6)." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012). To determine whether a complaint has crossed "the line from conceivable to plausible," a court must employ a "context-specific inquiry," drawing on the court's "experience and common sense." *Iqbal*, 556 U.S. at 680. When ruling on a Rule 12(b)(6), a court accepts "all well-pled facts as true and construes these facts in the light most favorable to the plaintiff in weighing the legal sufficiency of the complaint." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009). A court, however, does not afford the same deference to legal conclusions. *Iqbal*, 556 U.S. at 678.

Where, as here, a defendant files a Rule 12(b)(1) motion to dismiss for lack of subject-matter jurisdiction, "plaintiff bears the burden of proving that subject matter jurisdiction properly exists in the federal court." *Biktasheva v. Red Square Sports, Inc.*, 366 F.Supp.2d 289, 294 (D. Md. 2005). A district court should grant a Rule 12(b)(1) motion only when "the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Id.* (internal quotation marks omitted)

## ANALYSIS

### A. Plaintiffs' Motion to Strike or File Surreply

Plaintiffs have filed a motion to strike parts of the City's Reply, or, in the alternative, file a surreply.  Plaintiffs contend that the City, for the first time in its Reply brief, raised new arguments regarding the deference owed to the City's rate-setting powers.  (*See* ECF No. 34, p. 2; *see also* ECF No. 28, pp. 3–8).  The City disagrees, arguing that it was merely responding to plaintiffs' contentions in their Opposition.  (ECF No. 37, p. 3).

"The ordinary rule in federal courts is that an argument raised for the first time in a reply brief or memorandum will not be considered."  *Clawson v. FedEx Ground Package Sys., Inc.*, 451 F. Supp. 2d 731, 734 (D. Md. 2006).  The rationale underlying this rule is "to avoid prejudice to the party who is not afforded a chance to rebut a new argument."  *EEOC v. Freeman*, 961 F. Supp. 2d 783, 801 (D. Md. 2013).  A court, however, has discretion to deviate from this rule and consider a previously unraised argument, especially when the other party has had an opportunity to respond.  *See Clawson*, 451 F. Supp. 2d at 734.  Here, plaintiffs have attached to their motion a proposed surreply responding to the City's new arguments.  Plaintiffs therefore will have had an adequate opportunity to respond to the City's new arguments if I grant their motion to file a surreply (which the City does not oppose).  And I will have the benefit of considering the City's new arguments if I deny plaintiffs' motion to strike.  Accordingly, I deny plaintiffs' motion to strike and grant their motion to file a surreply.  *See Minter v. Wells Fargo Bank, N.A.*, 283 F.R.D. 268, 270 n.3 (D. Md. 2012) (granting a motion for leave to file a surreply in like circumstances).

### B. Plaintiffs' Motion to Dismiss

Plaintiffs' twelve claims can be broken down into five categories. The first category encompasses plaintiffs' TCA claim (Count I), wherein they allege that the City's fee increase, as well as its discriminatory treatment of plaintiffs in favor of Verizon, compels preemption of the City's conduit regulations. The second category is plaintiffs' breach of contract, violation of police power, and unjust enrichment claims (Counts III, VI, and XI). Each of these claims turns on whether the City's revenues from the new conduit fee exceed its actual cost for maintaining and operating the conduit. The third category of claims is plaintiff Comcast's Cable Act and breach of contract claims (Counts II and IV), which allege that the City's conduit fees are illegal franchise fees under the Cable Act. The fourth category is plaintiffs' Fifth Amendment (Count VII), First Amendment (VIII), 42 U.S.C. §§ 1983 and 1988 (Count IX), and tortious interference with economic and contractual relations (Count X) claims, which allege that the City violated plaintiffs' legal rights by threatening to remove their communications facilities from the conduit. The last category of claims includes a claim that the City violated art. VI, §3(b) of the Baltimore City Charter (Count V) by failing to proffer notice of the conduit fee increase and an overarching claim for declaratory judgment (Count XII).

## I.    Plaintiffs' TCA Claim (Count I)

Plaintiffs contend that the City's regulatory scheme is preempted[5] by the TCA to the extent it requires them to install and use communications facilities in the City's conduit system,

---

[5] After the Supreme Court's decision in *Gonzaga Univ. v. Doe*, 536 U.S. 273, 274 (2002) holding that "[f]or a statute to create private rights, its text must be phrased in terms of the persons benefited," all circuit courts to consider the question have held that § 253 of the TCA does not confer a private right of action for damages. *See Spectra Commc'ns Grp., LLC v. City of Cameron, Mo.*, 806 F.3d 1113, 1120 (8th Cir. 2015); *NextG Networks of NY, Inc. v. City of New York*, 513 F.3d 49, 52–53 (2d Cir. 2008); *Sw. Bell Tel., LP v. City of Houston*, 529 F.3d 257, 260–62 (5th Cir. 2008); *Sprint Telephony PCS, L.P. v. Cnty. of San Diego*, 490 F.3d 700, 716–18 (9th Cir. 2007); *Qwest Corp. v. City of Santa Fe, New Mexico*, 380 F.3d 1258, 1265–67 (10th Cir. 2004). Therefore, plaintiffs' TCA claim should be considered as a preemption claim. That

imposes fees that exceed the City's cost to maintain and operate the conduit system, and favors

the incumbent telecommunications provider, Verizon, over them. (ECF No. 1, ¶ 116). For its

part, the City argues that plaintiffs have failed to plead a plausible TCA claim and that the City's

actions are entitled to deference under the TCA. Because I find that the plaintiffs plead a

plausible TCA claim, however, Count I survives.

Congress enacted the TCA "to ensure that telecommunications providers have

competitive access to state and local telecommunications markets." *Puerto Rico Tel. Co. v.*

*Municipality Of Guayanilla*, 450 F.3d 9, 15 (1st Cir. 2006). The TCA was a manifestation of

Congress's intent to "end[ ] the States' longstanding practice of granting and maintaining local

exchange monopolies." *AT & T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 405 (1999) (Thomas, J.,

concurring in part, dissenting in part). The section of the TCA at issue here, section 253, puts in

place a general bar to local government actions that "prohibit or have the effect of prohibiting the

ability of any entity to provide any interstate or intrastate telecommunications service." 47

U.S.C. § 253(a). § 253(a) is "a clear expression by Congress of an intent to preempt local

ordinances which prohibit the provision of telecommunications services." *Qwest Corp. v. City of*

*Santa Fe, New Mexico*, 380 F.3d 1258, 1269 (10th Cir. 2004). Subsection (c) of § 253, by

contrast, provides local governments with a safe-harbor from subsection (a)'s general

prohibition, stating that:

> Nothing in this section affects the authority of a State or local
> government to manage the public rights-of-way or to require fair
> and reasonable compensation from telecommunications providers,
> on a competitively neutral and nondiscriminatory basis, for use of
> public rights-of-way on a nondiscriminatory basis, if the
> compensation required is publicly disclosed by such government.

---

is, the claim turns on whether the TCA preempts the City's regulatory scheme under the
Supremacy Clause of the Constitution.

47 U.S.C. § 253(c). Put another way, subsection (c) authorizes state and local governments "to regulate telecommunication services on public property and to collect compensation for its use, if certain parameters are observed." *Global Network Commc'ns, Inc. v. City of New York*, 562 F.3d 145, 151 (2d Cir. 2009).

While the Fourth Circuit has yet to formulate a legal standard for an § 253(a) preemption claim, sister circuits have determined that an § 253(a) claim involves two parts. First, a court decides whether the "local provision in question is prohibitive in effect." *Qwest*, 380 F.3d at 1269. To meet this requirement, a plaintiff "need not show a complete or insurmountable prohibition . . . but it must show an existing material interference with the ability to compete in a fair and balanced market." *Level 3 Commc'ns, L.L.C. v. City of St. Louis, Mo.*, 477 F.3d 528, 533 (8th Cir. 2007) (citing to the FCC's interpretation of § 253(a)); *see also Qwest*, 380 F.3d at 1269 (a provision "need not erect an absolute barrier to entry in order to be found prohibitive"). In *Qwest*, the Tenth Circuit found that a "near quadrupl[ing]" of cost was sufficient to show that city regulations were prohibitive because the increase in cost would "materially inhibit" the provision of communications services. 380 F.3d at 1271.

If a plaintiff demonstrates that a regulatory action is prohibitive, the burden shifts to defendant to show that the regulation falls under the safe-harbor of § 253(c). To carry its burden, a defendant must show that its action relates to regulation of the public rights of way, is "fair and reasonable," and is imposed "on a competitively neutral and nondiscriminatory basis." *Id.* at 1272. If the local government's fee does not fit within the requirements of § 253(c), plaintiff's claim succeeds.

> ### i. It is plausible that the City's actions materially interfered with plaintiffs' provision of communications services

Plaintiffs plausibly show that the City's regulatory scheme has had the effect of prohibiting plaintiffs' provision of "interstate or intrastate telecommunications service[s]."[6] 47 U.S.C. § 253(a).

First, plaintiffs have pleaded facts showing that the City's increase in fees had a prohibitive effect on their provision of telecommunications services. The City's raising of the conduit fee was both sudden and significant. According to plaintiffs, the conduit fee increased from $.98 to $3.33 per linear foot with just one month's notice—this after the rate had only increased from $.83 to $.98 over the course of nearly a decade. (*See* ECF No. 1, ¶ 67). Quantum, the only plaintiff so far to pay the increased fee, has been forced to stop construction on a project to extend its network. *See id.* at ¶ 105. As in *Qwest*, the City's more than tripling of fees may have constituted a "massive increase in cost," 380 F.3d at 1271, that materially interfered with plaintiffs' ability to provide communications services. *See also Puerto Rico Tel. Co. v. Municipality Of Guayanilla*, 450 F.3d 9, 19 (1st Cir. 2006) (holding that where increased costs "place a significant burden" on communications providers, they are prohibitive). On this ground alone, plaintiffs have plausibly shown a violation of § 253(a).

---

[6] As an initial matter, the City argues that the contested conduit fee is a proprietary fee outside the ambit of the TCA. I disagree. The City's conduit fee, though it arises out of plaintiffs' leasing agreements with the City, is governmental in nature, and thus, falls within the boundaries of the TCA. The Maryland Court of Appeals has noted that "[w]here the act in question is sanctioned by legislative authority, is solely for the public benefit, with no profit or emolument inuring to the municipality, and tends to benefit the public health and promote the welfare of the whole public, and has in it no element of private interest, it is governmental in its nature." *Austin v. City of Baltimore*, 405 A.2d 255, 259 (Md. 1979) (internal quotation marks omitted). The conduit fees are sanctioned by Baltimore City Ordinance, *see* Balt. City Code, Art. 26, § 23–5, and are assessed exclusively for the public benefit. (*See* ECF No. 1, ¶ 39 ("The Conduit Fund is an 'enterprise fund' used to account for the operating of various City activities that are provided to the public on a cost reimbursement basis.")). Accordingly, the fees are governmental and their legality can properly be considered under the TCA.

Likewise, the City's overall conduit scheme, which allows only Verizon to maintain its

own conduit system, and prevents plaintiffs from using Verizon's conduit, may create a

"material interference with [plaintiffs'] ability to compete in a fair and balanced market." *Level

3*, 477 F.3d at 533. The Second Circuit has observed that to allow a municipality "to strengthen

the competitive position of the incumbent service provider would run directly contrary to the

pro-competitive goals of the TCA." *TCG New York, Inc. v. City of White Plains*, 305 F.3d 67, 79

(2d Cir. 2002). Similarly, the F.C.C. has noted that a government contract giving one competitor

"exclusive physical access to rights-of-way that are inherently less costly to use . . . . would be

inconsistent with section 253(a) . . . ." *In the Matter of the Petition of the State of Minnesota for

A Declaratory Ruling Regarding the Effect of Section 253 on an Agreement to Install Fiber

Optic Wholesale Transp. Capacity in State Freeway Rights-of-Way*, 14 F.C.C. Rcd. 21697,

21709 (F.C.C. 1999). The City permits Verizon to operate and maintain its own conduit system,

allowing it to control its costs, and charges Verizon less than $.07 per linear foot for the space

that it leases in the public right of way. (ECF No. 1, ¶ 34). Further, Verizon's costs for renting

the right of way have not changed since the 19th century. *Id.* at ¶ 68. In comparison, the City

prohibits plaintiffs and other providers from building their own conduit systems; charges them

$3.33 per linear foot to lease space in the City's conduit; bars them from interconnecting their

wires with Verizon's conduit, *see id.* at ¶¶ 32, 56; and when plaintiffs do install their own

conduit, they must then deed ownership of the new conduit to the City, and pay the City fees for

conduit that they themselves built, *see id.* at ¶ 37. This scheme plausibly creates a competitive

advantage for Verizon. Therefore, by virtue of its granting Verizon "exclusive physical access to

rights-of-way that are inherently less costly to use," the City may be acting in a manner

"inconsistent with section 253(a)." *In the Matter of the Petition of the State of Minnesota*, 14 F.C.C. Rcd. at 21709.

Additionally, by increasing plaintiffs' fees, the City may exacerbate Verizon's advantage over plaintiffs. The fee increase more than triples plaintiffs' fees but has no effect on Verizon, which has been paying the same low fees to rent the City's right of way since the 19th century. Because the plaintiffs' costs have significantly increased, and Verizon's costs remain the same, the City's decision to increase plaintiffs' fees may serve "to strengthen the competitive position of the incumbent service provider," and thus, may violate § 253(a). *TCG New York, Inc.*, 305 F.3d at 79.

Accordingly, since, taking plaintiffs' allegations as true, the City suddenly and dramatically raised plaintiffs' fees, prevented plaintiffs from interconnecting with Verizon's conduit, and discriminated against plaintiffs in favor of Verizon, plaintiffs have plausibly shown they meet the first part of the § 253 test.

ii. **Plaintiffs have pleaded facts plausibly showing that the City's actions did not fit within the § 253(c) safe-harbor**

Second, plaintiffs have plausibly shown that the City's actions do not qualify for the § 253(c) safe-harbor. To prove it is entitled to the safe-harbor, the City must show that its action were both "fair and reasonable" and imposed on "a competitively neutral and nondiscriminatory basis." 47 U.S.C. § 253(c). Putting aside the question of whether the City's actions were fair and reasonable, plaintiffs have plausibly shown that the City's actions did not fit within the safe-harbor because the City did not act on a competitively neutral and nondiscriminatory basis. Namely, plaintiffs have pleaded sufficient facts showing that the City treated Verizon and plaintiffs differently even though they were in the same telecommunications market. Plaintiffs are now obligated to pay $3.33 per linear foot of conduit space—in comparison, Verizon pays

only $.07 per linear foot to rent the underground right of way. (ECF No. 1, ¶ 68). Moreover, although the City adjusts plaintiffs' fees every year, Verizon and its predecessor have paid the same fees for right of way access since 1889. *Id.* And while plaintiffs are forced to use the City's conduit system, Verizon is given free range to own and operate its own conduit network. (*See id.* at ¶ 25). Although Verizon and plaintiffs are paying for different services—leasing of conduit space versus leasing of the public right of way—the purported disparity in treatment between Verizon and its competitors, shows that the City's action may be neither competitively neutral nor nondiscriminatory.

The City's argument that Verizon and plaintiffs are differently situated and thus, not susceptible to comparison, is unavailing. (ECF No. 14, p. 20). To the extent any difference exists, it only exists because the City made it so by allowing Verizon, but not plaintiffs, to own and operate its own conduit system. Accordingly, because the City's alleged discrimination in favor of Verizon may prevent "rough parity between competitors," *TCG New York, Inc.*, 305 F.3d at 80, plaintiffs have plausibly shown that the City's actions do not qualify for the § 253(c) safe-harbor. *See also id.* ("[A] municipality may not . . . impose a host of compensatory provisions on one service provider without placing any on another.").

### iii. Contrary to the City's arguments, its actions are not entitled to deference at this stage

The City further argues that its actions are entitled to deference under the TCA and therefore, dismissal of the plaintiffs' TCA action is warranted. (*See* ECF No. 28, pp. 4–8). It argues that federal courts traditionally review state agency's decisions under the "substantial evidence" test and that a similar level of review––like the rational basis standard of review— should apply to its actions when analyzed here. Even assuming, without deciding, that the City is right about the deference owed to its actions, the City's argument is unconvincing at this stage.

13

This is because the issue of deference goes to the sufficiency of plaintiffs' evidence and not to the sufficiency of their allegations, which is properly the emphasis of a Rule 12(b)(6) inquiry. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999) ("The purpose of a Rule 12(b)(6) motion is to test the sufficiency of a complaint; importantly, a Rule 12(b)(6) motion does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.") (internal citations and alterations omitted). While the City may well be entitled to deference at a later stage, at this stage, there are only pleadings, and no evidence, to evaluate. As discussed *supra*, plaintiffs have put forth allegations plausibly showing a TCA preemption claim. This is all that is needed for Count I to survive and accordingly, the City's deference argument cannot compel dismissal of plaintiffs' TCA claim.

*   *   *

In conclusion, because plaintiffs have pleaded facts showing that the City's regulatory scheme materially interferes with their "ability to compete in a fair and balanced market." *Level 3 Commc'ns*, 477 F.3d at 533, and that the City's actions did not fit within the § 253(c) safe-harbor, plaintiffs have plausibly pleaded a TCA preemption claim and Count I survives.

## II.     Plaintiffs' breach of contract, violation of police power, and unjust enrichment claims (Counts III, VI, and XI)

Plaintiffs Zayo, Level 3, Crown Castle, FiberLight, and Quantum assert a breach of contract claim against the City (Count III). Further, all plaintiffs assert a violation of police power claim (Count VI) and an unjust enrichment claim (Count XI) against the City. The City argues that the plaintiffs fail to state a claim on all three counts and that deference to its actions warrants dismissal of the counts.[7] I disagree.

---

[7] The City also argues that Counts III, IV, and XI are not ripe for judicial review, claiming that these counts are entirely premised on plaintiffs' speculative belief that the City will spend the

The analysis here is quite simple. As the City acknowledges in other briefing, Counts III, VI, and XI turn on whether the plaintiffs' rates are based on their share of the City's actual costs for maintaining and operating the conduit. (*See* ECF No. 10, pp. 20–21 ("the City is not disputing that both law and contract require it to charge only what is necessary to maintain the conduit"); *see also* ECF No. 14, pp. 12–14). In other words, the City admits that if revenues from the conduit fee exceed the City's costs for operating and maintaining the conduit, the fee is unlawful. Plaintiffs, throughout their complaint, plead exactly this. (*See* ECF No. 1, ¶¶ 81, 97–101, 135, 137, 158, 160, 198). They also allege that the City has not adequately justified the fee and that the fee will go toward paying "for a slew of wish list items and one-time expenses," which are not costs for operating and maintaining the conduit. *See id.* at ¶ 99. These allegations are all that is required under Rule 12(b)(6) for plaintiffs to sustain Counts III, VI, and XI.

The City argues that because it has discretion to set conduit fees, this Court is required to afford it deference. (*See* ECF No. 28, pp. 3–4). This argument fails at its root. While the City may be owed deference on other issues, the City has never had discretionary power to adjust conduit fees above its actual costs, which is the central question here. As the City acknowledges, it is bound by law and in contract to ensure that plaintiffs' fees are based on their share of the City's actual costs. (*See* ECF No. 10, pp. 20–21). As such, there is no credible argument that the City's fee increase is unreviewable. Moreover, as discussed *supra*, the question of deference

---

conduit fees on other projects. (*See* ECF No. 14, pp. 9–11). The City, however, mischaracterizes plaintiffs' claims. Instead of arguing that the City will spend the fees on other projects, Counts III, VI, and XI are based on plaintiffs' contention that the City has imposed fees that exceed their "share of the actual cost to the City of owning, operating, and maintaining" the conduit system. (ECF No. 1, ¶ 132; *see also id.* ¶¶ 133–35, 137, 156, 160, 198). Plaintiffs premise these counts on the validity of the new fee, which the City has already imposed, and not on future, conjectural events. Accordingly, because the calculation and imposition of the fee is "final and not dependent on future uncertainties," *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006), plaintiffs' Counts III, IV, and XI are ripe.

goes to the sufficiency of plaintiffs' evidence, and not their allegations, which are properly the focus of a Rule 12(b)(6) motion. Accordingly, the City's deference argument is unavailing on this ground too.

*     *     *

In sum, taking plaintiffs' allegations that the City has imposed a conduit fee that exceeds the City's actual costs for maintaining and operating the conduit as true, plaintiffs have pleaded a plausible claim with respect to Counts III, IV, and XI and those counts survive.

### III.     Comcast's Cable Act and Breach of Contract Claims (Counts II and IV)

Plaintiff Comcast argues that because the City imposed conduit fees in excess of five percent of revenues derived from Comcast's cable operations, the City violated § 542 of the Cable Act (Count II) and their contractual obligations to Comcast (Count IV). But because Comcast cannot show that the conduit fees constitute franchise fees for the purposes of the Cable Act, it has failed to state a claim on these two counts.

Baltimore currently assesses a five percent franchise fee and an additional conduit fee (the same one all other conduit users pay) on Comcast. (*See* ECF No. 1, ¶ 61). By the terms of § 542 of the Cable Act and Comcast's franchise agreement with the City, the City may not impose franchise fees, as defined by the Cable Act, that exceed five percent of Comcast's gross revenues. The Cable Act states that "[f]or any twelve-month period, the franchise fees paid by a cable operator with respect to any cable system shall not exceed 5 percent of such cable operator's gross revenues derived in such period from the operation of the cable system to provide cable services." 47 U.S.C. § 542(b). A franchise fee is defined as "any tax, fee, or assessment of any kind imposed by a franchising authority or other governmental entity on a cable operator or cable subscriber, or both, solely because of their status as such," *id.* at (g)(1),

16

but excludes "any tax, fee, or assessment of general applicability (including any such tax, fee, or

assessment imposed on both utilities and cable operators or their services but not including a tax,

fee, or assessment which is unduly discriminatory against cable operators or cable subscribers),"

*id.* at (g)(2)(A).  Comcast's franchise agreement with the City, which allows Comcast to offer

cable services in Baltimore, provides for a five percent franchise fee and also that:

> Nothing in this Agreement shall be construed as a waiver of any
> laws, regulations or rules of the City or of the City's right to
> require the Franchisee . . . to secure the appropriate permits or
> authorizations for such use, provided that the fees and charges
> imposed upon the Franchisee for any such permit or authorization
> shall be the standard fees or charges generally applicable to all
> Persons for such permits or authorizations, and any such standard
> fee or charge: (i) shall not be considered a "franchise fee" under 47
> U.S.C. § 542(g)(1); (ii) shall fall within the exception to such term
> pursuant to 47 U.S.C. § 542(g)(2)(A); and (iii) shall not be an
> offset against the compensation or other payment the
> Franchisee . . . is required to pay the City . . . .

(ECF No. 1, Ex. 4, §2.1(C)).  As both parties agree, Counts II and IV turn on whether the conduit

fees are franchise fees for the purposes of the Cable Act.

I find that, as a matter of law, the conduit fees are not franchise fees for two reasons.

First, the conduit fees do not fall under § 542(g)'s definition of a franchise fee because the City

does not assess the fee against Comcast "solely because of [its] status" as a cable operator—

rather, the City assesses the fee against Comcast because it is a user of the conduit.  Each conduit

user, cable operator or not, is subject to the same fee.  Second, even ignoring that the conduit

fees do not fall under § 542(g)'s general franchise fee definition, they meet the requirements of

the § 542(g)(2)(A) exception.  The conduit fees are an assessment of general applicability against

*all* users of the City's conduit system; that is, they are a "fee . . . imposed on both utilities [like

BGE] and cable operators," and also on other communications providers.  47 U.S.C. §

542(g)(2)(A).  And the fees are not "unduly discriminatory against cable operators" because,

17

again, they are assessed against every user of the conduit system.[8] *Id.* Accordingly, the conduit

fees are not franchise fees pursuant to the Cable Act. For that reason, Counts II and IV fail as a

matter of law and are dismissed.

### IV.   Plaintiffs' Fifth Amendment, First Amendment, 42 U.S.C. §§ 1983 and 1988, and Tortious Interference Claims  (Counts VII, VIII, IX, X)

Plaintiffs also assert a variety of claims related to the City's threats to remove their

communications facilities from the conduit if they continue to refuse to pay the increased conduit

fee. First, plaintiffs allege that the City has violated their Fifth Amendment rights by threatening

to unlawfully take their communications facilities (Count VII). Second, plaintiff Comcast

contends that the City's threats violate its First Amendment rights (Count VIII). For the alleged

constitutional violations, plaintiffs seek monetary, injunctive, and declaratory relief pursuant to

42 U.S.C. § 1983 and attorneys' fees pursuant to 42 U.S.C. § 1988 (Count IX). Lastly, plaintiffs

also allege that the City's threatened removal of their communications networks constitutes

tortious interference with their economic and contractual relations (Count X). The City argues

that each of these claims should be dismissed because its alleged threats have never been

executed.[9] I agree that plaintiffs' claims are not ripe and dismiss them on this basis.

---

[8] *Liberty Cablevision Of Puerto Rico, Inc. v. Municipality Of Caguas*, 417 F.3d 216 (1st Cir. 2005), cited by plaintiffs, ostensibly reaches the opposite result. *Liberty Cablevision*, however, is distinguishable from the instant case. There, the defendant municipalities charged plaintiff telecommunications providers' two franchise fees for the same benefit: use of the public right of way. Here, by contrast, Comcast's conduit fee covers its use of the City conduit, which is separate and apart from its use of the public right of way. Even notwithstanding this difference between the two cases, I find the reasoning in *Liberty Cablevision* unpersuasive because it conflicts with the plain language of the Cable Act.

[9] While the City never explicitly mentions ripeness, it cites cases discussing the doctrine. *See, e.g., Hodel v. Virginia Surface Min. & Reclamation Ass'n, Inc.*, 452 U.S. 264 (1981); *Sansotta v. Town of Nags Head*, 724 F.3d 533 (4th Cir. 2013). And further, because ripeness is an issue going to a court's jurisdiction, and there is an "obligation to inquire *sua sponte* whenever federal jurisdiction is in doubt," *Verizon Maryland, Inc. v. Glob. NAPS, Inc.*, 377 F.3d 355, 383 (4th Cir. 2004), I am compelled to consider the ripeness of these claims.

"Ripeness is a question of subject matter jurisdiction." *Sansotta v. Town of Nags Head*, 724 F.3d 533, 548 (4th Cir. 2013) (internal alterations and citations omitted). As such, where a claim is not ripe, it must be dismissed pursuant to Rule 12(b)(1). To make a ripeness determination, a court considers two issues: the fitness of the claim, and "the hardship that the parties will experience if the court withholds consideration of the dispute." *Scoggins v. Lee's Crossing Homeowners Ass'n*, 718 F.3d 262, 270 (4th Cir. 2013). As to the first factor, a claim is unfit for review "if the plaintiff has not yet suffered injury and any future impact remains wholly speculative." *Doe v. Virginia Dep't of State Police*, 713 F.3d 745, 758 (4th Cir. 2013). In the administrative context, a case is fit for review where "the issues to be considered are purely legal ones and where the agency rule or action giving rise to the controversy is final and not dependent upon future uncertainties or intervening agency rulings." *Charter Fed. Sav. Bank v. Office of Thrift Supervision*, 976 F.2d 203, 208 (4th Cir. 1992), *as amended* (Nov. 2, 1992). The second factor—hardship to the parties—is "measured by the immediacy of the threat and the burden imposed on the petitioner who would be compelled to act under threat of enforcement of the challenged law." *Id.* at 208–09.

The ripeness doctrine differs depending on the nature of the claim. For instance, to assert a ripe Fifth Amendment claim, a plaintiff must first identify property that has been taken. *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U.S. 264, 294–295 (1981) (finding plaintiffs' taking claim unripe because they had not "identified any property" that had been taken). Likewise, when plaintiffs assert a Fifth Amendment takings claim against "a state or its political subdivisions" in federal court, as they do here, plaintiffs' claim is ripe only when they have "sought compensation 'through the procedures the State has provided for doing so.'" *Sansotta*, 724 F.3d at 544 (quoting *Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank of*

19

*Johnson City*, 473 U.S. 172, 194 (1985)). For First Amendment claims, ripeness requirements are "somewhat relaxed" to prevent government actions from chilling speech. *Cooksey v. Futrell*, 721 F.3d 226, 240 (4th Cir. 2013). Practically, this means that if a government action chills a plaintiff's speech or causes a plaintiff "to adjust its conduct immediately," then review of that action is permitted under the ripeness doctrine even before the action occurs. *Id.* (internal quotation marks and citations omitted); *cf. Kramer v. Grossman*, No. 13-1745, 2014 WL 937146, at *8 (D. Md. Mar. 10, 2014).

i.   **Plaintiffs' Fifth Amendment, First Amendment, §§ 1983 and 1988, and tortious interference claims are unfit for judicial review**

Plaintiffs' Fifth Amendment claim is unfit for judicial review because, put simply, no taking has occurred. That is, there is no allegation that the City has followed through on its alleged threats to remove plaintiffs' communications facilities from the conduit. In fact, there is no allegation that the City has taken *any* of plaintiffs' property. This alone is sufficient to show that plaintiffs' Fifth Amendment claim is unfit for review. *See Hodel*, 452 U.S. at 294–295. Moreover, even if there was a specific allegation of a taking, which there is not, plaintiffs have not pleaded facts demonstrating that they sought compensation from the City for a taking. Again, this by itself is sufficient to make plaintiffs' takings claim unfit for judicial consideration. *See Sansotta*, 724 F.3d at 544. Third, Plaintiffs' Fifth Amendment claim is unfit for judicial review because it is conjectural and accordingly, does not exist "in an actual factual setting that makes [a judicial] decision necessary." *Hodel*, 452 U.S. at 294–95. The City has allegedly threatened plaintiffs with a taking, but the force of those threats would be obviated by plaintiffs' payment of the disputed fee or by the City's retreat from them. Plaintiffs' Fifth Amendment

claim is thus dependent on future uncertainties—how they and the City will act—and is unfit for judicial review.[10]

Second, Comcast's First Amendment claim is also unfit for review. Comcast contends that if the City removes any of Comcast's communication facilities from the conduit, "it will destroy Comcast's ability to engage in and transmit speech in the City in violation of the First Amendment." (ECF No. 1, ¶ 173). But again, Comcast's claim is contingent on events that have yet to occur, *i.e.*, Comcast's continuing refusal to pay the disputed fee and the City carrying out its threats. Comcast "has not yet suffered injury and any future impact remains wholly speculative," *Doe v. Virginia Dep't of State Police*, 713 F.3d 745, 758 (4th Cir. 2013), and accordingly, its First Amendment claim is not yet fit for judicial review. That the ripeness requirements for First Amendment claims are relaxed does not change the result. There is no allegation, and indeed, it would be implausible to imagine, that the City's threats have chilled Comcast's speech or caused it to change its conduct. Instead, Comcast's First Amendment claim is wholly premised on what *could* happen in the future if the City carries out its threats. (*See* ECF No. 1, ¶¶ 170–76). Therefore, because Comcast's First Amendment claim is hypothetical, and Comcast neither pleads facts showing that the City's actions have had a chilling effect on its speech nor that they have changed Comcast's behavior, Comcast's First Amendment claim is unfit for judicial review.

Thirdly, plaintiffs' §§ 1983 and 1988 claims are derivative of their First and Fifth Amendment claims; thus, because plaintiffs' constitutional claims are unfit for judicial review, so too are their §§ 1983 and 1988 claims.

---

[10] I held *supra* that plaintiffs' claims arising out of the fee increase (Counts III, IV, and XI) were ripe. Those claims are distinguishable from the claims here because the fee increase has already occurred and the issue to be resolved for those counts—whether the City's fee increase exceeds its actual costs for maintaining and operating the conduit—is final and justiciable.

Lastly, plaintiffs' tortious interference claim is also unfit for review. As with their constitutional claims, plaintiffs base this count wholly on their prediction that the City will carry out its alleged threats. Because premising their claim on these allegations renders plaintiffs' claim purely hypothetical, this claim is also not yet fit for consideration.[11]

> **ii.    Because plaintiffs are not under immediate threat of removal, and can seek identical relief from other claims, they do not suffer hardship from dismissal**

As to the second step of the ripeness analysis, plaintiffs will not suffer significant hardship from dismissal of their claims. Plaintiffs' escrow agreement with the City, which prevents the City from executing its threats, is still in effect and protects plaintiffs' communications facilities from removal. Furthermore, several of plaintiffs' other claims that survive the City's motion to dismiss seek the same relief as plaintiffs' claims here. (*See, e.g.,* ECF No. 1, ¶¶ 139, 160, 202). Accordingly, if plaintiffs prevail on those surviving claims, they will be entitled to the same relief as if they had prevailed on their constitutional and tortious interference claims. And finally, if plaintiffs do not prevail in this litigation and the City decides to remove plaintiffs' communications facilities, plaintiffs would still be able to seek compensation from the City through the procedures set out in Md. Code Ann., Real Prop. § 12, which governs takings in Maryland.

*              *              *

---

[11] Alternatively, plaintiffs fail to state a tortious interference claim. To adequately show a claim for tortious interference under Maryland law, a plaintiff must plead "actual damage and loss." *Alexander & Alexander Inc. v. B. Dixon Evander & Associates, Inc.*, 650 A.2d 260, 269 (Md. 1994). Here, because none of the City's threats have been executed, there is no actual damage or loss. Therefore, plaintiffs' tortious interference claim is also dismissed on this ground.

To conclude, because plaintiffs' claims relating to the City's threats are not yet ripe, plaintiffs' Fifth Amendment, First Amendment, §§ 1983 and 1988, and tortious interference claims (Counts VII, VIII, IX, X) are dismissed.

## V.   Plaintiffs' Baltimore City Charter and Declaratory Judgment Claims (Counts V and XII)

Plaintiffs also assert two miscellaneous claims relating to the City's actions. First, they claim that the City violated Baltimore City Charter art. VI, §3(b) by failing to provide notice of the conduit fee increase thirty days before it was approved (Count V). Second, plaintiffs assert an overarching claim for declaratory judgment, pursuant to 28 U.S.C. § 2201, for each claim in their complaint (Count XII).

### i.   Plaintiffs fail to state a plausible claim relating to the Baltimore City Charter

Plaintiffs argue that the City's fee increase was procedurally improper because the City did not provide notice of the fee increase at least 30 days prior to its passage, which is required by Baltimore City Charter, Art. VI, §3(b). The City argues that plaintiffs' claim fails because the Baltimore City Charter only requires that the City provide notice of the annual Ordinance of Estimates, and the City approved the fee increase after it had already passed the fiscal year 2016 Ordinance. I agree with the City.

Art. VI, § 3 of the City Charter reads:

> § 3. Fiscal year; budget schedule.
>
> (a) Fiscal year.
> The fiscal, budget, and accounting year of the City shall begin on the first day of July and end on the thirtieth day of June in every year unless otherwise provided by law.
>
> (b) Notice and hearing.
> At least thirty days prior to the adoption by the Board of Estimates of a proposed Ordinance of Estimates the Board shall make public

23

the Director of Finance's recommended operating budget, the
Planning Commission's recommended capital budget and long-
range capital improvement program, and the reports of the Director
of Finance and Planning Commission on these documents.

Thereafter, the Board shall hold public hearings at which members
of the City Council, heads of municipal agencies, and citizens shall
have the opportunity to appear before the Board to speak for or
against the inclusion of any appropriation in the proposed
Ordinance of Estimates

The plain meaning of the notice provision of Art. VI, § 3 shows that it does not cover the

conduit fee increase. Under the provision, the City was required to give notice of certain

documents relating to the Ordinance of Estimates at least 30 days before the start of the 2016

fiscal year, July 1, 2015. So at the very latest, notice of the documents relating to the proposed

2016 Ordinance of Estimates was due June 1, 2015. By comparison, it is undisputed that the

City considered and adopted the disputed conduit fee in September 2015, and that the conduit fee

went into effect starting in November 2015. Both of these dates occurred several months after

notice of documents under Art. VI, § 3 was due for fiscal year 2016. Thus, it is clear that Art.

VI, § 3 did not apply to the conduit fee increase because it would have been impossible for the

City to comply with the notice requirements.[12] Likewise, no other Charter provision required

notice of the conduit fee increase. For example, there is no mention in the Charter that notice of

supplemental expenditures like the conduit fee increase, which were proposed *after* the notice

---

[12] Plaintiffs' argument that notice of the conduit fee increase was required because the City is
required to include in the Ordinance of Estimates any "supplementary appropriation ordinances,"
Art. I, § 2(h), misses the point. (*See* ECF No. 25, pp. 21–22). What the notice provision of Art.
VI, § 3 requires and what the City is required to include in the final Ordinance of Estimates are
distinct. That is, the notice provision of Art. VI, § 3 does not require disclosure of a complete
and final Ordinance of Estimates for the upcoming year; rather, it requires disclosure—at least
30 days before adoption of a new budget—of documents relating to a *proposed* Ordinance of
Estimates. To require the City to publically distribute a complete and final Ordinance of
Estimates each time it passed a supplementary appropriation, as plaintiffs propose, would be at
odds with the plain meaning of the Charter. Accordingly, plaintiffs argument on this point is
unavailing.

deadline had run, is required.  The subsection governing supplementary expenditures, Art. VI,

§8(c), sets out several requirements, but makes no mention of notice.  The same goes for other

sections of the Charter.  Accordingly, neither Art. VI, § 3 nor any other Charter provision

required notice of the fee increase at issue here.  On this ground, I dismiss Count V.

> **ii.  Plaintiffs' claim for declaratory judgment (Count XII) survives with respect to Counts I, III, VI, and XI and is dismissed with respect to Counts II, IV, V, VII, VIII, IX, and X**

Plaintiffs' last claim is one for declaratory judgment pursuant to 28 U.S.C. § 2201.  As

this claim is derivative of the claims that come before it, it survives only to the extent that those

survive.  Thus, since Counts II, IV, V, VII, VIII, IX, and X are dismissed, plaintiffs' claim for

declaratory judgment on these counts is also dismissed.  Conversely, because Counts I, III, IV,

and XI survive, plaintiffs' claim for declaratory judgment on these counts survives.

## CONCLUSION

For the foregoing reasons, the City's motion to dismiss plaintiffs' complaint is granted in

part and denied in part.  Counts II, IV, V, VII, VIII, IX, and X of plaintiffs' complaint are

dismissed and Counts I, III, VI, and XI survive in full.  With respect to Count XII, it is dismissed

as it relates to Counts II, IV, V, VII, VIII, IX, and X and survives as it relates to Counts I, III, VI,

and XI.  Additionally, plaintiffs' motion to strike is denied and their motion to file a surreply is

granted.  A separate order follows.

_____                    _____
Date                                        J. Frederick Motz
                                            United States District Judge